# Illinois Official Reports

## Appellate Court

---

*Sentry Insurance v. Continental Casualty Co.*, 2017 IL App (1st) 161785

---

| | |
|---|---|
| Appellate Court Caption | SENTRY INSURANCE, a Mutual Company, Plaintiff and Counterdefendant, v. CONTINENTAL CASUALTY COMPANY; NORTHWESTERN MEDICAL FACULTY FOUNDATION; THEODORE FRANK; NICHOLAS HARRIS; JOE DOES 1-59; JANE DOES 1-50; JOSEPH DOE; JAMES DOES 1-2; JANE DOE; JAMES ANONYMOUS; JOHN ANONYMOUS; and JEFFREY DOE, Defendants (Continental Casualty Company, Defendant and Counterplaintiff-Appellant; Northwestern Medical Faculty Foundation, Defendant and Counterdefendant-Appellee). |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-1785 |
| Filed | March 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CH-16745; the Hon. Kathleen Pantle, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Karen W. Howard and Dawn Gonzalez, of Colliau, Carluccio, Keener, Morrow, Peterson & Parsons, of Chicago, for appellant.<br><br>Jill B. Berkeley, Seth D. Lamden, and Andrew G. May, of Neal, Gerber & Eisenberg LLP, of Chicago, for appellee. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
                        Justices Hall and Lampkin concurred in the judgment and opinion.


**OPINION**

¶ 1        The instant interlocutory appeal concerns the trial court's grant of a stay on the issue of whether Continental Casualty Company (Continental) owes a duty to indemnify Northwestern Medical Faculty Foundation (the Foundation) for any liability the Foundation incurs as a result of a number of lawsuits filed against it based on the failure of the Foundation's cryogenic tanks, which had held semen and testicular tissue specimens that were rendered unusable. Continental argues that the trial court erred in granting the stay because interpreting the two applicable exclusions to insurance coverage would not have involved the determination of an ultimate fact in the underlying litigation. Alternatively, Continental argues that if the trial court stayed the analysis concerning the applicability of the policy's exclusions, it should have also stayed the litigation concerning whether there was a duty to defend the Foundation under the policy. Continental also argues in the alternative that the trial court should have, at a minimum, determined coverage issues concerning two lawsuits that had already been settled. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3        On October 16, 2014, Sentry Insurance[1] (Sentry) filed a complaint for declaratory judgment against the Foundation and Continental, alleging that Sentry had issued a commercial general liability insurance policy to the Foundation and that the Foundation claimed that Sentry owed it a duty to defend and indemnify for approximately 65 lawsuits in which the Foundation had been named as a defendant (the underlying lawsuits) and which had been consolidated for pretrial activities. Continental was named in the complaint as the Foundation's excess insurer. Sentry's complaint alleged that its policy did not provide coverage for the claims alleged against the Foundation and sought a declaratory judgment that it owed no duty to defend or indemnify the Foundation and reimbursement of the amount spent thus far in defending the underlying lawsuits.

¶ 4        According to Sentry's complaint, the Foundation owned and operated a cryopreservation and storage tank for semen and testicular tissue; certain Foundation patients, including the plaintiffs in the underlying lawsuits (the underlying plaintiffs), provided semen or testicular tissue to the Foundation for storage and safekeeping; and the Foundation received storage fees for the cryopreservation of the semen and testicular tissue from the underlying plaintiffs. Certain patients who had stored semen or testicular tissue with the Foundation between April and June 2012, including the underlying plaintiffs, alleged that their samples had thawed and were irreversibly damaged due to the failure of the Foundation's cryopreservation tank. The underlying plaintiffs accordingly filed the underlying lawsuits against the Foundation and

---

[1]Sentry is not a party to the instant appeal, as it has settled its disputes with the Foundation. However, its pleadings and the motions concerning Sentry are still set forth in our statement of facts, as they are interrelated with the claims made by Continental.

Northwestern Memorial Hospital (the Hospital), seeking damages relating to the allegedly damaged semen and testicular tissue.

¶ 5    According to Sentry's complaint, the Foundation admitted in the underlying lawsuits that it owned and operated the cryopreservation tank for semen and testicular tissue, that certain patients provided semen for storage and safekeeping with the Foundation, that the Foundation accepted the semen supplied by certain patients for safekeeping, and that the Foundation received storage fees for cryopreservation of the semen. Additionally, the Hospital denied in the underlying lawsuits that it owned, operated, managed, or controlled the cryopreservation tank for semen and testicular tissue; that certain patients provided semen for storage and safekeeping with the Hospital; that the Hospital accepted the semen supplied by certain patients for safekeeping; and that the Hospital received storage fees for cryopreservation of the semen.

¶ 6    Sentry's complaint alleges that the Foundation tendered the underlying lawsuits to Sentry, seeking defense and indemnity pursuant to the Foundation's insurance policy with Sentry, and that Sentry accepted the Foundation's tender of the defense under a reservation of rights.

¶ 7    According to Sentry's complaint, John Anonymous,[2] one of the underlying plaintiffs, filed a motion for summary judgment against the Foundation, contending that the Foundation was liable to him under a bailment theory. Sentry alleged that in order to prevail on a bailment claim, it was necessary to establish (1) an express or implied agreement to create a bailment, (2) delivery of the property in good condition, (3) the bailee's acceptance of the property, and (4) the bailee's failure to return the property or the bailee's redelivery of the property in a damaged condition. Sentry's complaint alleged that on March 12, 2014, the trial court in the consolidated underlying lawsuits entered summary judgment in favor of John Anonymous "relative to elements (1), (3) and (4), thereby establishing that a bailment was created and that [the Foundation] had exclusive possession of the specimens."

¶ 8    Sentry's complaint set forth 15 "claims," each serving as a basis for exclusion under its policy, and requested a declaration that Sentry had no obligation to defend or indemnify the Foundation against the claims asserted in the underlying lawsuits. Sentry also requested reimbursement of the funds it had expended in defending the Foundation in the underlying lawsuits.

¶ 9    The Sentry insurance policy, which was attached to Sentry's complaint, contained two exclusions that are relevant to the instant appeal: a "care, custody, or control" exclusion and a "professional services" exclusion. The "care, custody, or control" exclusion provided that the insurance did not apply to property damage to "[p]ersonal property in the care, custody or control of the insured." The "professional services" exclusion provided that "[t]his insurance does not apply to 'bodily injury', 'property damage' or 'personal and advertising injury' due to the rendering of or failure to render any professional service." The exclusion further defined "professional services" as "all professional liability relating to health care medical malpractice, druggist liability, to include accountants E & O as well as directors and officers liability."

¶ 10    On November 20, 2014, Continental filed an answer and counterclaim. The counterclaim contained substantially identical factual allegations as Sentry's complaint regarding the

_____

[2]According to Sentry's complaint, with the exception of two named individuals, the rest of the underlying plaintiffs obtained judicial orders permitting them to proceed in the underlying lawsuits with their legal names kept under seal.

allegations of the underlying lawsuits. Continental's counterclaim also alleged that (1) the Foundation made a number of admissions in a third-party complaint that the Foundation had filed in the underlying lawsuits, including that the Foundation provided storage in a cryogenic tank located on the 20th floor of the Foundation for the semen and testicular tissue of the male underlying plaintiffs; (2) the Foundation was a faculty medical practice at the hospital; (3) the Foundation used an electronic controls system on the cryogenic tank that was designed to cause a page to be sent to a Foundation lab technician when an alarm was triggered by the control system; and (4) on the afternoon of April 23, 2012, a Foundation lab technician discovered that the cryogenic tank at the Foundation had failed to maintain a proper temperature.

¶ 11    In its counterclaim, Continental alleged that it issued to the Foundation a commercial umbrella policy and that in order for the Foundation to obtain coverage from Continental's policy, "it must prove that it is entitled to coverage under the [Continental] Umbrella Policy insuring provision, including all of [Continental's] terms, definitions and conditions," which it could not do. First, Continental alleged that the Foundation could not establish that "bodily injury" or "property damage" occurred during the policy period, as required under the policy. Additionally, like Sentry's policy, Continental's policy included a "care, custody, or control" exclusion and a "professional services" exclusion. The "care, custody, or control" exclusion provided that the insurance coverage did not apply to property damage to "[p]ersonal property in the care, custody or control of the insured." The "professional services" exclusion provided:

> "This insurance does not apply to any liability arising out of any act or omission, or rendering of or failure to render professional services by you or any other person for whose acts you are legally responsible, and arising out of the performance of professional services for others in your capacity as a (an):
> (Insert Profession of Service)
> Professional Healthcare Services"

Continental's counterclaim alleged that, even if the Foundation could establish that it complied with all of the policy's terms, conditions, and definitions, coverage in connection with the underlying lawsuits would still be excluded by the "care, custody, or control" or "professional services" exclusions. Accordingly, Continental sought a declaration that Continental owed no coverage to the Foundation.

¶ 12    On January 12, 2015, the Foundation filed a combined motion under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2014)) to dismiss Sentry's complaint or, alternatively, to stay the complaint. On the same day, the Foundation also filed a section 2-619.1 motion to dismiss Continental's counterclaim and expressly adopted its arguments in support of its motion to dismiss Sentry's complaint into its motion to dismiss Continental's counterclaim.

¶ 13    The Foundation argued that Sentry's request for an adjudication of its duty to defend should be dismissed under section 2-619 of the Code (735 ILCS 5/2-619 (West 2014)) because the resolution of that issue required the adjudication of facts that overlapped with disputed liability issues in the underlying lawsuits. The Foundation argued that Sentry's arguments concerning the care, custody, or control exclusion and the professional services exclusion were premature "because it is not clear and free from doubt from the face of the allegations in any of the underlying complaints that either of these policy exclusions precludes coverage and the Court cannot make coverage determinations based on disputed liability facts at issue in the

pending Underlying Actions." Sentry argued that determining whether the exclusions applied would require the trial court to determine "ultimate facts" in the underlying lawsuits, including whether the Foundation had exclusive possessory control over the semen samples at the time they were allegedly damaged and the responsibilities of the parties involved with the cryogenic process. Sentry similarly argued that the determination of whether the underlying lawsuits sought damaged for "bodily injury" or "property damage" would require an adjudication of disputed liability issues in the underlying lawsuits.

¶ 14    The Foundation also argued that Sentry's request for an adjudication that it owed no duty to indemnify the Foundation should be dismissed under section 2-615 of the Code (735 ILCS 5/2-615 (West 2014)) because the Foundation had not yet incurred any liability in the underlying lawsuits. With respect to Continental, the Foundation claimed that Continental was not presently defending the Foundation and so its "request for a declaration concerning its duty to defend is premature and should be dismissed for this reason alone."

¶ 15    In the alternative, the Foundation argued that if dismissal was not the proper course, then the declaratory judgment claims should be stayed because "[a] stay would conserve judicial resources by reducing the discovery required in the coverage action, narrowing the scope of disputed issues, and otherwise avoiding the duplication of effort that is inherent when litigation proceeds on parallel tracks."

¶ 16    In response, Continental argued that the issues in the declaratory judgment action would not require the trial court to determine ultimate facts in the underlying lawsuits because the court "will only need to apply undisputed facts to the pertinent policy language." Continental further argued that since there was no potential for coverage, the issues concerning both the duty to defend and the duty to indemnify were ripe for adjudication. Continental also adopted Sentry's response to the motion to dismiss, which claimed that the grant of summary judgment in John Anonymous' favor against the Foundation established that the Foundation had exclusive possession of the specimens, as did the Foundation's answers to the pleadings in the underlying lawsuits. Thus, determination of whether the care, custody, or control exception applied would not require adjudication of an ultimate fact. Sentry's response further argued that the Foundation's arguments concerning the litigation of the Foundation's third-party claims were not applicable, as the Foundation's third-party claims concerned the tank that allegedly failed and its component parts and did not concern possession of the specimens themselves.

¶ 17    In supplemental briefing, Continental also argued that two of the plaintiffs in the underlying lawsuits had voluntarily dismissed their complaints against the Foundation with prejudice. Continental thus argued that even if the coverage litigation was not appropriate for most of the cases, at the very least, coverage litigation should proceed with respect to the two cases the Foundation had resolved. Continental further requested that, if a stay was entered, the stay should only apply until each underlying lawsuit was resolved.

¶ 18    On May 19, 2016, the trial court granted in part and denied in part the Foundation's motion. In its order, it discussed Sentry's arguments and noted that "[t]he arguments raised by [Continental] in its counterclaim are substantially identical to those asserted by Sentry in its complaint." First, the court found that "[a]t this point, the appropriate action is to stay the determination of the duty to indemnify until the duty to defend has been determined," not to dismiss it, as dismissal would result in a waste of judicial resources. Next, the court found that the determination of whether the care, custody, or control exclusion applied would require the

determination of an ultimate fact in the underlying litigation, since the court would need to make a determination as to whether the Foundation had exclusive control, and one of the ultimate facts in the underlying litigation was who had possession of the specimens. The court thus found that "a stay is appropriate." The court rejected Sentry's reliance on the partial summary judgment entered in the John Anonymous case, finding that the judge in that case had not made any factual findings as to whether the Foundation had exclusive care, custody, or control over the specimens at the time of the loss and that the issue in a bailment action was possession at the beginning of the bailment, not at the time of the loss. The court also rejected Sentry's reliance on the Foundation's discovery responses in the underlying lawsuits, noting that the Foundation had never conceded that it exercised exclusive possession of the specimens at the time of the tank's failure.

¶ 19    The court also found that the professional services exclusions in the insurers' policies were not ripe for adjudication. The court found that the language of the exclusion in the Continental policy differed from that in the Sentry policy but did not otherwise differentiate the two policies. In analyzing a professional services exclusion, the court found that the question was whether the activity "involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual." The court found that "[i]t is not apparent from the underlying complaints whether the maintenance of cryogenically preserved sperm requires 'specialization or expertise', or is merely incidental to any professional services [the Foundation] provides. The underlying complaints contain no description or detail as to how sperm samples are cryogenically preserved, much less whether cryogenic preservation of sperm is 'predominantly mental or intellectual as opposed to physical or manual.' " The court found that, to make that determination, "the Court would have to look at extrinsic evidence (outside the pleadings) which the Court cannot do if it tends to determine an issue crucial to the determination of the underlying lawsuit." The court additionally found that "in order to determine whether the professional services exclusion applied[,] the Court would have to find that the underlying complaints assert claims for 'health care malpractice'.[3] A trial court presiding over an insurance coverage declaratory judgment action should not decide whether an underlying defendant committed malpractice when that decision would bind the parties in the underlying litigation."

¶ 20    With respect to the issue of whether the underlying lawsuits sought damages for "bodily injury" or "property damage" under the policies such that there was a duty to defend, the court found that this issue was ripe for adjudication. The court found that, in determining whether there was a duty to defend, it could decide whether the allegations of the underlying complaints contained sufficient facts to show the potential for coverage and, accordingly, determined that it would "proceed with litigating the duty to defend analysis."

¶ 21    Finally, the trial court found that it could not adjudicate coverage issues in the two underlying lawsuits that had settled, since a ruling concerning those cases could still have a collateral estoppel effect on the remaining underlying plaintiffs. The court further noted that the Foundation also had third-party complaints pending "which could be impacted by a ruling by this Court."

---

[3]Although the trial court did not make the distinction in its order, we note that this language is specific to the Sentry policy and does not appear in the Continental policy.

¶ 22     On June 8, 2016, Sentry filed a notice of appeal, and on June 17, 2016, Continental joined in Sentry's notice of appeal and also filed its own notice of appeal. Sentry ultimately settled with the Foundation and asked this court to dismiss its appeal, which we did on October 25, 2016, leaving only Continental's appeal remaining.

¶ 23                                ANALYSIS

¶ 24     On appeal, we are asked to consider whether the trial court properly entered a stay on Continental's insurance coverage issues. While our appellate jurisdiction is normally limited to review of final judgments (see *State Farm Mutual Automobile Insurance Co. v. Illinois Farmers Insurance Co.*, 226 Ill. 2d 395, 415 (2007)), we have jurisdiction in the instant interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010), which allows for appeals from interlocutory orders "granting, modifying, refusing, dissolving, or refusing to dissolve or modify an injunction." See, *e.g.*, *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 39 ("Under established Illinois law, the denial of a stay of trial court proceedings is treated as a denial of a request for a preliminary injunction and is appealable as a matter of right under Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010)."); *Marzouki v. Najar-Marzouki*, 2014 IL App (1st) 132841, ¶ 8 ("This court has consistently held that a stay is injunctive in nature and a stay order is immediately appealable under Rule 307(a)(1)."); *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 33 (noting that "the appellate court has repeatedly held that Rule 307 permits the interlocutory appeal of a stay of court proceedings"). We find that this appeal does not require us to consider the merits of the coverage issues, which will be ultimately decided by the trial court but requires us only to consider the question of when the coverage issues should be decided—now, or after the resolution of the underlying lawsuits.

¶ 25     The trial court in the instant case found that what it called the "duty to defend analysis," namely, the question of whether the underlying lawsuits sought damages for "bodily injury" or "property damage" as defined by the insurance policies, was a question that it could determine prior to the resolution of the underlying lawsuits. However, it found that the applicability of the "care, custody, or control" and "professional services" exclusions would require the adjudication of ultimate facts in the underlying lawsuits and accordingly stayed consideration of those exclusions. On appeal, Continental argues that the trial court erred in staying the coverage litigation concerning the applicability of the two exclusions. In the alternative, Continental argues that if litigation concerning the exclusions was stayed, then litigation concerning the "duty to defend analysis" should likewise have been stayed. Also in the alternative, Continental argues that if a stay was proper, the stay should not apply to the two underlying cases that have been settled.

¶ 26                            I. Standard of Review

¶ 27     As an initial matter, we must discuss the standard of review applicable to our analysis. Continental argues that we should review the propriety of the trial court's stay *de novo*, while the Foundation argues that we should review it under an abuse of discretion standard. Our courts have consistently found that "[t]he decision to grant or deny a motion to stay will not be overturned unless the court abused its discretion." *Guarantee Trust Life Insurance Co. v. Platinum Supplemental Insurance, Inc.*, 2016 IL App (1st) 161612, ¶ 35; *Cholipski*, 2014 IL App (1st) 132842, ¶ 39. Continental recognizes that "Illinois courts have generally applied the

abuse of discretion standard" in this type of situation. However, it argues that there is a "recent trend" for courts to apply a *de novo* standard in a Rule 307(a)(1) appeal if the question presented is purely legal, as it argues the instant case is. We agree with the Foundation that Continental overstates the importance of this purported "recent trend" which, in fact, is not a recent trend at all.

¶ 28    Over 20 years ago, our supreme court found that "in an interlocutory appeal, the scope of review is normally limited to an examination of whether or not the trial court abused its discretion in granting or refusing the requested interlocutory relief. [Citations.] However, where the question presented is one of law, a reviewing court determines it independently of the trial court's judgment. [Citation.]" *In re Lawrence M.*, 172 Ill. 2d 523, 526 (1996). While, as noted, Continental acknowledges that the propriety of an order granting or denying a stay is normally analyzed for an abuse of discretion, Continental argues that the cases applying an abuse of discretion standard for stay orders issued in insurance coverage declaratory judgment actions "have been called into question" by three cases: *Coe v. BDO Seidman, L.L.P.*, 2015 IL App (1st) 142215, *Fuqua v. SVOX AG*, 2014 IL App (1st) 131429, and *Bovay v. Sears, Roebuck & Co.*, 2013 IL App (1st) 120789. We do not find this argument persuasive.

¶ 29    First, as Continental acknowledges in its briefs on appeal, *Fuqua* applied an abuse of discretion standard of review, so it does not support Continental's argument in favor of the application of a *de novo* standard of review. See *Fuqua*, 2014 IL App (1st) 131429, ¶ 15 ("this court applies the abuse of discretion standard of review in evaluating this appeal"). Additionally, as the Foundation points out, both *Coe* and *Bovay* involve motions to stay litigation and compel arbitration, which is not the issue in the instant case. While Continental argues that this distinction is irrelevant, we disagree.

¶ 30    "The circuit court may stay proceedings as part of its inherent authority to control the disposition of cases before it. [Citation.] The court may consider factors such as the orderly administration of justice and judicial economy in determining whether to stay proceedings." *Philips Electronics, N.V. v. New Hampshire Insurance Co.*, 295 Ill. App. 3d 895, 901-02 (1998). For this reason, the trial court's decision to grant a stay is reviewed under an abuse of discretion standard. *Philips Electronics*, 295 Ill. App. 3d at 902. However, in both *Coe* and *Bovay*, the motion to stay was filed in connection with arbitration proceedings. See *Coe*, 2015 IL App (1st) 142215, ¶ 10 (the motion at issue was "a motion to stay the action in favor of arbitration"); *Bovay*, 2013 IL App (1st) 120789, ¶ 12 (the motion at issue was "a motion to compel arbitration and stay the proceedings"). Both motions expressly stated that the stay was sought pursuant to section 3 of the Federal Arbitration Act, which provides that, "[i]f any suit or proceeding [is] brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending *** shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (1994); see *Coe*, 2015 IL App (1st) 142215, ¶ 10; *Bovay*, 2013 IL App (1st) 120789, ¶ 12. Thus, in these cases, the issue was whether the matter should be arbitrated, not whether the matter should be stayed, because if the matter was to be arbitrated, it was required to be stayed under the Federal Arbitration Act pending that arbitration. This distinguishes these cases from the usual type of case in which a stay is a matter of the trial court's discretion in controlling its docket and in no way "call[s] into question" the general rule that stays are reviewed for an abuse of discretion.

¶ 31    Furthermore, we find unpersuasive Continental's claims that the instant case involves no factual issues and requires only "a purely legal analysis" of the applicable law. As noted, and as will be further discussed below, the trial court's decision in the instant case turned on its determination that the issues present in the coverage litigation would overlap with "ultimate facts" at issue in the underlying lawsuits, therefore making a stay appropriate. The trial court expressly rejected Continental's arguments that the Foundation had already conceded the relevant facts in its pleadings and answers to discovery in the underlying cases. Continental uses those same arguments now to support its contention that there are no factual issues at play and that the coverage litigation involves only legal issues. Continental's argument is thus putting the cart before the horse because only if we agree with its arguments concerning the Foundation's purported admissions could we find that there were no factual issues in dispute.

¶ 32    In the case at bar, therefore, we find that the appropriate standard of review is abuse of discretion, not *de novo*. "The standard of 'abuse of discretion' is the most deferential standard of review recognized by the law; a decision will be deemed an abuse of discretion only if the decision is 'unreasonable and arbitrary or where no reasonable person would take the view adopted by the circuit court.' " *Pekin Insurance Co. v. St. Paul Lutheran Church*, 2016 IL App (4th) 150966, ¶ 69 (quoting *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 64).

¶ 33                                    II. Stay of Exclusions
¶ 34    Continental's primary argument on appeal is that the trial court erred in staying the consideration of whether its "care, custody, or control" and "professional services" exclusions apply to preclude coverage under the Continental insurance policy.

¶ 35                              A. Duties to Defend and Indemnify
¶ 36    We begin our analysis by setting forth the applicable law concerning an insurer's duties to defend and indemnify an insured. In Illinois, the duties to defend and to indemnify are not coextensive, with the obligation to defend being broader than the obligation to pay. *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.*, 168 Ill. App. 3d 361, 366 (1988). In determining whether an insurer has a duty to defend its insured, a court looks to the allegations in the underlying complaint and compares them to the relevant provisions of the insurance policy. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 107-08 (1992). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Outboard Marine*, 154 Ill. 2d at 108. However, if it is clear from the face of the complaint that the allegations fail to state facts that bring the case within, or potentially within, the policy's coverage, an insurer may properly refuse to defend. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73 (1991) (quoting *State Farm Fire & Casualty Co. v. Hatherley*, 250 Ill. App. 3d 333, 336 (1993)).

¶ 37    Additionally, "a circuit court may, under certain circumstances, look beyond the underlying complaint in order to determine an insurer's duty to defend." *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 459 (2010). " 'It is certainly true that the duty to defend flows in the first instance from the allegations in the underlying complaint; this is the concern at the initial stage of the proceedings when an insurance company encounters the primary decision of whether to defend its insured. However, if an insurer opts to file a declaratory proceeding, we believe that it may properly challenge the existence of such a duty by offering evidence to

prove that the insured's actions fell within the limitations of one of the policy's exclusions. [Citations.] The only time such evidence should not be permitted is when it tends to determine an issue crucial to the determination of the underlying lawsuit [citations] ***.' " *Wilson*, 237 Ill. 2d at 461 (quoting *Fidelity & Casualty Co. of New York v. Envirodyne Engineers, Inc.*, 122 Ill. App. 3d 301, 304-05 (1983)). Thus, if there is no concern that a crucial issue will be determined, the trial court may consider evidence that would otherwise be appropriate at that stage of the proceedings. See *Wilson*, 237 Ill. 2d at 462 (noting that *Envirodyne Engineers* involved evidence available in summary judgment proceedings, while *Wilson* involved evidence available in a grant of judgment on the pleadings).

¶ 38        "[W]here an exclusionary clause is relied upon to deny coverage, its applicability must be clear and free from doubt because any doubts as to coverage will be resolved in favor of the insured." *International Minerals & Chemical Corp.*, 168 Ill. App. 3d at 367; see also *Wilson*, 237 Ill. 2d at 456 (" 'provisions that limit or exclude coverage will be interpreted liberally in favor of the insured and against the insurer' " (quoting *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997))). "[W]here the language of an insurance policy is clear and unambiguous, it will be applied as written." *Hatherley*, 250 Ill. App. 3d at 337. The construction of an insurance policy presents a question of law that is reviewed *de novo*. *Outboard Marine*, 154 Ill. 2d at 108. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Erie Insurance Exchange v. Compeve Corp.*, 2015 IL App (1st) 142508, ¶ 14.

¶ 39        An insurer's duty to indemnify is narrower than its duty to defend its insured. *Outboard Marine*, 154 Ill. 2d at 127. "[T]he question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for [adjudication] if the insured has already incurred liability *** against it." *Outboard Marine*, 154 Ill. 2d at 127. "If so, the duty to indemnify arises if the insured's activity and the resulting loss or damage *actually* fall within the *** policy's coverage." (Emphasis in original.) *Outboard Marine*, 154 Ill. 2d at 128. However, if a court determines that the insurer has no duty to defend, "it may simultaneously determine that the insurer has no duty to indemnify." *Abrams v. State Farm Fire & Casualty Co.*, 306 Ill. App. 3d 545, 549 (1999). "In cases *** where no duty to defend exists and the facts alleged do not even fall *potentially* within the insurance coverage, such facts alleged could obviously never *actually* fall within the scope of coverage. Under no scenario could a duty to indemnify arise. Clearly, where there is no duty to defend, there will be no duty to indemnify ***." (Emphases in original.) *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 398 (1993). In the case at bar, although only the duty to indemnify is at issue with respect to Continental's policy, Continental claims that the issue is ripe for adjudication because there was no duty to defend.

¶ 40                                    B. *Peppers* Doctrine

¶ 41        In the case at bar, the trial court determined that it was premature to consider whether the "care, custody, or control" and "professional services" exclusions applied to deny coverage to the Foundation and instead decided to stay the coverage litigation on this question. The court's decision to stay the determination of these coverage issues was based on its application of the "*Peppers* doctrine," which was set forth by our supreme court in *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187 (1976).

¶ 42    In the declaratory judgment action at issue in *Peppers*, the trial court was asked to determine whether an insurer owed a duty to defend its insured in a personal injury action that alleged intentional, negligent, and willful and wanton conduct; the insurance policy at issue specifically excluded coverage for intentionally inflicted injuries. *Peppers*, 64 Ill. 2d at 190, 193. After a bench trial, the trial court found that the insured's actions were intentional, and therefore, there was no coverage under the policy. *Peppers*, 64 Ill. 2d at 191. Our supreme court, however, found that "[b]y virtue of the interrelation of the various issues involved in the litigation between [the underlying plaintiff] and [the insured] and between [the insured] and [the insurer] we must conclude that this finding by the trial court constituted an abuse of the discretion vested in it" under the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, ¶ 57.1). *Peppers*, 64 Ill. 2d at 196. The supreme court found that under the principle of collateral estoppel, the finding in the declaratory judgment action that the injury was intentionally inflicted "could possibly establish the allegations of the assault count in the complaint and might preclude [the underlying plaintiff's] right to recover under the other theories alleged." *Peppers*, 64 Ill. 2d at 197. The supreme court cited with approval an appellate court case finding that such a judgment under similar circumstances was premature and found that "[t]he finding of the trial court in our case that the injury was intentional was not proper in this declaratory judgment action. This issue was one of the ultimate facts upon which recovery is predicated in the *** personal injury action against [the insured], which had been filed considerably before the declaratory judgment action had been instituted." *Peppers*, 64 Ill. 2d at 197. This ruling has come to be known as the "*Peppers* doctrine." *TIG Insurance Co. v. Canel*, 389 Ill. App. 3d 366, 373 (2009).

¶ 43    "Under the *Peppers* doctrine, 'it is generally inappropriate for a court considering a declaratory judgment action to decide issues of ultimate fact that could bind the parties to the underlying litigation.' " *Landmark American Insurance Co. v. NIP Group, Inc.*, 2011 IL App (1st) 101155, ¶ 59 (quoting *Allstate Insurance Co. v. Kovar*, 363 Ill. App. 3d 493, 501 (2006)). "This proscription specifically precludes determination of any ultimate facts upon which liability or recovery might be predicated in the underlying case." *NIP Group*, 2011 IL App (1st) 101155, ¶ 59. Thus, it is an abuse of discretion for a trial court in a declaratory judgment action to make such a determination. *Peppers*, 64 Ill. 2d at 196; *Empire Fire & Marine Insurance Co. v. Clarendon Insurance Co.*, 267 Ill. App. 3d 1022, 1027 (1994).

¶ 44    Our supreme court in *Peppers* did not define the term "ultimate fact" and has subsequently used other terms to stand for the same proposition. In *Thornton v. Paul*, our supreme court, relying on *Peppers*, found that "it would not be appropriate, under the facts of this case, for the insurer to seek a declaratory judgment that the insured's conduct constituted a battery and was thus beyond the coverage of the insurance policy. In such a proceeding, *an issue crucial to the insured's liability in the personal injury action* and also one on which punitive damages could ultimately be assessed would be determined in a purely ancillary proceeding with the plaintiff and defendant in the personal injury action both aligned on the same side as defendants in the declaratory judgment action." (Emphasis added.) *Thornton v. Paul*, 74 Ill. 2d 132, 159 (1978), *overruled in part on other grounds by American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378 (2000). In *Savickas*, the supreme court reaffirmed the "rule" relied on by the *Thornton* court "that it is inappropriate to resolve a declaratory judgment action in such a manner *as would bind the parties in the underlying litigation on any issues therein.*" (Emphasis added.) *Savickas*, 193 Ill. 2d at 387. Thus, in applying the *Peppers* doctrine, courts

have had to determine whether the facts to be decided in the declaratory judgment action would be considered "ultimate facts" such that the coverage litigation was premature.

¶ 45    For instance, in *Envirodyne Engineers*, the appellate court began its analysis by attempting to define "ultimate fact." The court noted:

> "Both *Peppers* and *Thornton* are instructive as to what matters cannot be determined in a declaratory judgment proceeding prior to the completion of the underlying action. *Peppers* states that an ultimate fact upon which recovery is predicated in the underlying case may not be addressed. The court's language suggests that an ultimate fact is one which would estop the plaintiff in the underlying case from pursuing one of his theories of recovery. *Thornton* implies that an ultimate fact is one in which 'an issue crucial to the insured's liability' in the underlying case is determined. Apparently only then would the inequities surface in regard to alignment of the parties and the order and burden of proof, because those matters necessarily arise in any declaratory judgment proceeding brought before completion of the underlying lawsuit. Thus, in examining the facts in the instant case, we must decide whether the plaintiff in the underlying lawsuit would be estopped from raising a theory of recovery or if the trial court decided an issue crucial to the insured's liability in the underlying case." *Envirodyne Engineers*, 122 Ill. App. 3d at 307.

Applying this standard, the *Envirodyne Engineers* court noted that the sole issue determined by the trial court in the declaratory judgment proceeding was the nature of the services provided by the insured at a construction site, namely, that the insured was acting as a consulting engineer. *Envirodyne Engineers*, 122 Ill. App. 3d at 307. The court found that this determination in no way "estops the underlying plaintiff from raising a theory of recovery or decides any issue crucial to the underlying litigation." *Envirodyne Engineers*, 122 Ill. App. 3d at 308. The court noted that the allegations in the underlying complaint were for violations of the Structural Work Act and for negligence and found that "[a] finding that [the insured] performed as a consulting engineer in no way diminishes either theory of recovery advanced by the underlying plaintiff." *Envirodyne Engineers*, 122 Ill. App. 3d at 308. The court further found that the fact that the insured was acting as a consulting engineer was not an issue crucial to its liability in the underlying case because "the ultimate, or crucial, queries in this case revolve around whether [the insured] 'willfully' violated the Structural Work Act or whether [the insured] acted negligently. None of these questions hinges upon whether [the insured] did or did not serve in the capacity of consulting engineer for the construction project." *Envirodyne Engineers*, 122 Ill. App. 3d at 308. Accordingly, the court found that the nature of the insured's services was not an issue of ultimate fact. *Envirodyne Engineers*, 122 Ill. App. 3d at 308.

¶ 46    In the case at bar, the trial court determined that a finding concerning the applicability of the "care, custody, or control" and "professional services" exclusions would require it to determine ultimate facts in the underlying lawsuits. We consider each exclusion in turn, bearing in mind that, "[i]n determining whether to stay proceedings, the circuit court has discretion to consider factors such as the 'orderly administration of justice and judicial economy,' as well as its inherent authority to control the disposition of the cases before it." *TIG Insurance Co. v. Canel*, 389 Ill. App. 3d 366, 375 (2009) (quoting *Estate of Bass v. Katten*, 375 Ill. App. 3d 62, 68 (2007)).

¶ 48        Continental's insurance policy contained a "care, custody, or control" exclusion that provided that the insurance did not apply to property damage to "[p]ersonal property in the care, custody or control of the insured." "For this common exclusion, Illinois courts 'employ a two-part test. If the property damaged is within the possessory control of the insured at the time of the loss and is a necessary element of the work performed, the property is considered to be in the care, custody, or control of the insured.' " *Liberty Mutual Insurance Co. v. Zurich Insurance Co.*, 402 Ill. App. 3d 37, 40 (2010) (quoting *Caisson Corp. v. Home Indemnity Corp.*, 151 Ill. App. 3d 130, 133 (1986)). "With respect to whether an insured [has] possessory control of the property at the time of the loss, it has been noted that, '[w]hile the control exercised by the insured must be exclusive, it need not be continuous, and if the insured has possessory control at the time the property is damaged, the exclusion clause will apply.' " *Bolanowski v. McKinney*, 220 Ill. App. 3d 910, 914 (1991) (quoting *Country Mutual Insurance Co. v. Waldman Mercantile Co.*, 103 Ill. App. 3d 39, 42 (1981)); *Essex Insurance Co. v. Wright*, 371 Ill. App. 3d 437, 441 (2007); *Caisson Corp.*, 151 Ill. App. 3d at 133. Thus, in order for the trial court in the declaratory judgment action to determine that the "care, custody, or control" exclusion applied in the instant case, it would need to determine that the Foundation exercised exclusive control over the specimens at the time they were damaged.

¶ 49        Continental argues that this determination would not require the resolution of an ultimate fact in the underlying lawsuits. First, Continental argues that exclusive possessory control of the specimens at the time they were damaged is not necessary for either a bailment or negligence claim. While Continental correctly states that, in theory, neither a cause of action for bailment nor a cause of action for negligence requires exclusive possession at the time of the damage, Continental fails to consider the actual factual allegations in the underlying lawsuits.

¶ 50        The underlying lawsuits name both the Foundation and the Hospital as defendants and allege causes of action for bailment and negligence against both. With respect to the negligence claim against the Hospital, the underlying complaints allege[4] that, at the time the cryogenic tanks failed, the Hospital "had the duty to exercise ordinary care in the storage and preservation of the semen/testicular specimens" of the underlying plaintiffs and was negligent in, *inter alia*, "[f]ail[ing] to adequately maintain the semen/testicular tissue specimens in its possession"; "[f]ail[ing] to adequately store the semen/testicular tissue specimens in its possession"; and "[f]ail[ing] to adequately preserve the semen/testicular tissue specimens in its possession." Thus, the allegations of the underlying complaints expressly allege that the Hospital exercised possessory control over the specimens at the time they were damaged. Similarly, with respect to the bailment claim against the Hospital, the underlying complaints allege that the semen or testicular tissue specimens of the underlying plaintiffs "were damaged without [the underlying plaintiffs'] knowledge or consent while under the care of" the Hospital. Thus, the bailment claims allege that the specimens were under the Hospital's care at the time they were damaged.

¶ 51        As we have previously noted, in order for the trial court in the declaratory judgment action to determine that the "care, custody, or control" exclusion applied in the instant case, it would

---

[4]The underlying complaints, all of which were attached to Continental's counterclaim, are substantively identical.

need to determine that the Foundation exercised exclusive control over the specimens at the time they were damaged. However, this would contradict the allegations in the underlying complaint that allege that the Hospital exercised control over the specimens at that same time and would effectively preclude the underlying plaintiffs from proving their claims against the Hospital. This is exactly the type of factual determination that the *Peppers* doctrine prohibits.

¶ 52     We are not persuaded by Continental's arguments that the Foundation has already admitted that it retained exclusive control in its pleadings and answers to discovery such that the trial court's determination in the instant case would have no effect on the underlying lawsuits. Continental's arguments are based on the answer filed by the Foundation and the Hospital to the John Anonymous complaint, as well as the third-party complaint jointly filed by the Foundation and the Hospital. With respect to the answer filed in the John Anonymous complaint, that complaint did not state its allegations against the Foundation and the Hospital in separate paragraphs but discussed them together; for instance, paragraph 2 of the complaint alleged that "[i]n 2008, [the Hospital] and [the Foundation] owned, operated, managed, and controlled a cryopreservation storage tank for semen/testicular tissue located at their outpatient urology facility in the Galter Pavilion of [the Hospital]." The answer to that allegation, filed jointly by the Foundation and the Hospital, was: "[The Foundation] admits that it owned and operated a cryopreservation storage tank for semen/testicular tissue and denies the remaining allegations of paragraph 2. Further answering, defendant [the Hospital] denies owning, operating, managing, or controlling the cryopreservation storage tank for semen/testicular tissue located at [the Foundation]'s urology facility in the Galter Pavilion." Continental reads this answer, along with the Foundation's other answers, as the Foundation "fully conceding" that the Foundation had exclusive possessory control over the specimens at the time they were damaged. Continental's argument rests on the assumption that a denial in an answer operates as a concession that the corollary of that allegation is true; that is, under Continental's view, the Foundation's denial in the above-quoted answer operates as a concession that the Hospital *did not* own, operate, manage, or control the cryopreservation storage tank.

¶ 53     However, that is the opposite of the way in which answers to complaints operate. An answer is required to contain an explicit admission or denial of each allegation of the pleading to which it relates. 735 ILCS 5/2-610(a) (West 2014). "Every allegation *** not explicitly denied is admitted ***." 735 ILCS 5/2-610(b) (West 2014). In the case at bar, then, using the above-quoted answer as an example, the Foundation admitted only that it owned and operated a cryopreservation storage tank for semen/testicular tissue because it denied the remaining allegations of the paragraph, which related to the Hospital. Continental's position would require the court to interpret the Foundation's denial as a *concession* that the Hospital *did not* own, operate, manage, or control the cryopreservation storage tank, in effect conceding that the Foundation exercised exclusive possession over the tank. Continental provides no authority for this novel way of interpreting the Code of Civil Procedure, and we do not find its attempt to fashion an admission out of a denial to be persuasive. The Foundation's answers at most admit that it had control over the specimens and do not speak to whether that control was exclusive.

¶ 54     Similarly, the third-party complaint is silent as to exclusive control. Continental points to paragraph 13 of the third-party complaint, which alleges that "[a]t all relevant times, [the Foundation] provided storage for plaintiffs' semen and/or testicular tissue in a cryogenic freezer designed and manufactured by Horizon, Harsco and Taylor-Wharton. The freezer was located on the 20th Floor of [the Foundation]." Again, this allegation at most demonstrates that

- 14 -

the Foundation had control over the specimens, but says nothing about whether that control was exclusive. Thus, we do not find that the Foundation has conceded its exclusive possession of the specimens such that the trial court's decision in the instant insurance coverage litigation would not run afoul of the *Peppers* doctrine should it also make such a determination.

¶ 55 We are similarly unpersuaded by Continental's argument that the trial court's entry of partial summary judgment in the John Anonymous case necessarily resolved the issue of exclusive possession. The trial court in that case entered summary judgment on John Anonymous' bailment count "on elements 1, 3 & 4." The first element referred to by the trial court is "an express or implied agreement to establish a bailment." *Longo Realty v. Menard, Inc.*, 2016 IL App (1st) 151231, ¶ 21. Continental argues that the Foundation did not dispute that it entered into a bailment and, thus, conceded that it had exclusive possession. However, as the trial court pointed out, a bailment is created at the time of the delivery of the property, while the "care, custody, or control" exclusion concerns possession of the property at the time of the loss. See *Wausau Insurance Co. v. All Chicagoland Moving & Storage Co.*, 333 Ill. App. 3d 1116, 1121 (2002) ("A bailment is the delivery of property for some purpose upon a contract, express or implied, that after the purpose has been fulfilled, the property shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept until he reclaims it." (Internal quotation marks omitted.)); *Bolanowski*, 220 Ill. App. 3d at 914 ("if the insured has possessory control at the time the property is damaged, the exclusion clause will apply" (internal quotation marks omitted)). Thus, a finding that a bailment was created is not relevant to the issue of whether the Foundation exercised exclusive control over the specimens at the time the tank failed.

¶ 56 As a final matter concerning the "care, custody, or control" exclusion, Continental appears to believe it is "irrelevant" whether potential claims remain against the Hospital. However, by making this argument, Continental appears to miss the point of the *Peppers* doctrine. As our supreme court noted in that case, under the principle of collateral estoppel, the finding in the declaratory judgment action that the injury was intentionally inflicted "could possibly establish the allegations of the assault count in the complaint and might preclude [the underlying plaintiff's] right to recover under the other theories alleged." *Peppers*, 64 Ill. 2d at 197. The supreme court thus found that such a determination was an abuse of the trial court's discretion. *Peppers*, 64 Ill. 2d at 196. Similarly, here, a finding that the Foundation had exclusive possessory control over the specimens at the time of the damage could preclude the underlying plaintiffs' right to recover under the bailment and negligence theories they alleged in their complaints against the Hospital. Contrary to Continental's contention, this is the heart of the problem and is not "irrelevant." We thus cannot find that the trial court abused its discretion in deciding to stay the litigation concerning the "care, custody, or control" exclusion.

¶ 57                                              D. Professional Services Exclusion

¶ 58 Continental also argues that the trial court could have determined the applicability of its "professional services" exclusion without determining any ultimate facts in the underlying litigation. The "professional services" exclusion contained in the policy provided:

> "This insurance does not apply to any liability arising out of any act or omission, or rendering of or failure to render professional services by you or any other person for whose acts you are legally responsible, and arising out of the performance of professional services for others in your capacity as a (an):

(Insert Profession of Service)

Professional Healthcare Services"

¶ 59    In construing "professional services" exclusions, "courts have adopted an expansive definition of the term 'professional service.' The term is not limited to services performed by persons who must be licensed by a governmental authority in order to practice their professions. Rather, it refers to any business activity conducted by the insured which involves specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to physical or manual in nature." *State Street Bank & Trust Co. of Quincy, Illinois v. INA Insurance Co. of Illinois*, 207 Ill. App. 3d 961, 967 (1991); see also *Pekin Insurance Co. v. L.J. Shaw & Co.*, 291 Ill. App. 3d 888 (1997).

¶ 60    In the case at bar, the trial court found that "[i]t is not apparent from the underlying complaints whether the maintenance of cryogenically preserved sperm requires 'specialization or expertise', or is merely incidental to any professional services [the Foundation] provides. The underlying complaints contain no description or detail as to how sperm samples are cryogenically preserved, much less whether cryogenic preservation of sperm is 'predominantly mental or intellectual as opposed to physical or manual.' " The court found that, to make that determination, "the Court would have to look at extrinsic evidence (outside the pleadings) which the Court cannot do if it tends to determine an issue crucial to the determination of the underlying lawsuit."

¶ 61    Continental argues that "[a]ll of the alleged actions or omissions of [the Foundation] in the Cryogenic Tank Claims relate to [the Foundation]'s means and methods for preserving its patients' semen/testicular tissue specimens through a cryopreservation system within a cryogenic tank. [Citation.] Such cryogenic related activities clearly require specialized knowledge, labor or skill and are predominantly mental or intellectual." Thus, it argues that the allegations of the underlying complaints are sufficient to determine whether the Foundation's actions constitute "professional services" under the policy and that such a determination does not involve the resolution of any ultimate facts.

¶ 62    By contrast, the Foundation argues that the underlying complaints do not contain any detail as to how frozen sperm samples are maintained or what specialized knowledge or skill is required in maintaining them. Thus, the Foundation argues that the complaints alone are insufficient to answer this question. Furthermore, the Foundation argues that "the question of what [the Foundation] did—or did not do—as part of its cryopreservation program *is* what the Underlying Actions are all about. The claims against [the Foundation] turn on whether [the Foundation] was negligent in its efforts to maintain, store and preserve the samples, and what actions it took to monitor the tank or to safeguard the plaintiffs' samples. The evidence bearing on these critical issues is the same type of evidence that would inform whether the professional services exclusion applies." (Emphasis in original.)

¶ 63    Continental is correct that courts in other cases have considered the nature of an insured's work without running afoul of the *Peppers* doctrine. See, *e.g.*, *Bonnie Owen Realty, Inc. v. Cincinnati Insurance Co.*, 283 Ill. App. 3d 812, 817 (1996) (finding that the trial court properly determined that "[n]one of the allegations of negligence involve any specialized knowledge, labor, or skill, nor do they involve conduct which is predominantly mental or intellectual as opposed to physical of manual in nature"); *Envirodyne Engineers*, 122 Ill. App. 3d at 307-08 (noting that "[t]he sole issue determined by the trial court in the declaratory proceeding was the nature of the services performed by [the insured] at the job site," which did not estop the

underlying plaintiff from raising a theory of recovery or decide any issue crucial to the underlying litigation). However, the fact that other courts chose to decide the issue does not mean that the trial court in the instant action was required to do the same.

¶ 64    In the case at bar, the trial court found that it could not determine whether the Foundation's conduct constituted professional services by looking at the underlying complaints, and to make that determination, "the Court would have to look at extrinsic evidence (outside the pleadings) which the Court cannot do if it tends to determine an issue crucial to the determination of the underlying lawsuit." This latter statement by the trial court implies that it believed that determining the nature of the Foundation's conduct would require it to determine an issue crucial to the underlying lawsuits.

¶ 65    As noted, "[t]he decision to grant or deny a motion to stay will not be overturned unless the court abused its discretion." *Guarantee Trust Life Insurance*, 2016 IL App (1st) 161612, ¶ 35; *Cholipski*, 2014 IL App (1st) 132842, ¶ 39. Furthermore, "[i]n determining whether to stay proceedings, the circuit court has discretion to consider factors such as the 'orderly administration of justice and judicial economy,' as well as its inherent authority to control the disposition of the cases before it." *Canel*, 389 Ill. App. 3d at 375 (quoting *Estate of Bass*, 375 Ill. App. 3d at 68).

¶ 66    In the case at bar, we cannot find that the trial court abused its discretion in taking the more cautious approach and choosing not to decide an issue that it believed had the potential to affect the underlying lawsuits. Certainly, as the Foundation points out, the nature of the Foundation's conduct could touch on its liability for negligence and the liability of the third-party defendants. While Continental argues that the trial court did not need to determine whether the Foundation acted appropriately but only needed to determine whether the Foundation's conduct involved "specialized knowledge," we cannot find that the trial court's decision to stay that determination was so " 'unreasonable and arbitrary' " (*St. Paul Lutheran Church*, 2016 IL App (4th) 150966, ¶ 69 (quoting *Gulino*, 2015 IL App (1st) 131587, ¶ 64)) such that it constituted an abuse of discretion.

¶ 67    As a final matter on this issue, Continental argues that even if the allegations of the underlying complaints were insufficient to resolve this issue, the trial court could examine extrinsic evidence to determine the nature of the Foundation's activities. It claims that "[a]s in *Envirodyne*, evaluating extrinsic facts beyond the allegations in the complaints, as to the specifics of how [the Foundation] cryogenically preserved its patients' tissue in the cryogenic tank, will provide additional information to confirm that [the Foundation]'s actions involved special knowledge and training to support the application of the professional services exclusion." While we have already determined that the trial court appropriately stayed the consideration of this issue, we must caution that Continental takes an overly expansive view of what extrinsic evidence may be considered by the trial court.

¶ 68    As we have discussed earlier, "a circuit court may, under certain circumstances, look beyond the underlying complaint in order to determine an insurer's duty to defend" (*Wilson*, 237 Ill. 2d at 459), and an insurer may offer extrinsic evidence to prove that an exclusion applies unless " 'it tends to determine an issue crucial to the determination of the underlying lawsuit' " (*Wilson*, 237 Ill. 2d at 461 (quoting *Envirodyne Engineers*, 122 Ill. App. 3d at 304-05)). However, even if there is no concern that a crucial issue will be determined, the trial court may only consider evidence that would otherwise be appropriate at that stage of the proceedings. See *Wilson*, 237 Ill. 2d at 462 (noting that *Envirodyne Engineers* involved

evidence available in summary judgment proceedings, while *Wilson* involved evidence available in a grant of judgment on the pleadings). The *Wilson* court specifically cautioned that *Envirodyne Engineers*, which is cited by Continental in support of this argument, involved a summary judgment proceeding, which explained why that court was permitted to consider the evidence it did. See *Wilson*, 237 Ill. 2d at 462. By contrast, in *Wilson*, which was decided on the pleadings, our supreme court noted that it was limited by examining the pleadings alone. *Wilson*, 237 Ill. 2d at 462. Thus, *Envirodyne Engineers* does not stand for the proposition that *all* extrinsic evidence may be considered but only that the court in the declaratory judgment action may consider extrinsic evidence that would otherwise be appropriate at that stage of the proceedings and that does not determine a crucial issue in the underlying litigation.

¶ 69                                    III. Duty to Defend

¶ 70    Continental next argues that, if the trial court properly stayed litigation of whether the exclusions applied, it should have also stayed litigation on whether the underlying lawsuits alleged "bodily injury" or "property damage" such that there was a duty to defend under the language of its policy.[5] In the case at bar, with respect to the issue of whether the underlying lawsuits sought damages for "bodily injury" or "property damage" under the policies such that there was a duty to defend, the court found that this issue was ripe for adjudication. The court found that, in determining whether there was a duty to defend, it could decide whether the allegations of the underlying complaints contained sufficient facts to show the potential for coverage and, accordingly, determined that it would "proceed with litigating the duty to defend analysis." We cannot find that the trial court abused its discretion by proceeding to consider whether the allegations of the underlying complaints fall potentially within the policies' coverage such that there was a duty to defend.

¶ 71    As we have noted, in determining whether an insurer has a duty to defend its insured, a court looks to the allegations in the underlying complaint and compares them to the relevant provisions of the insurance policy. *Outboard Marine*, 154 Ill. 2d at 107-08. "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Outboard Marine*, 154 Ill. 2d at 108. However, if it is clear from the face of the complaint that the allegations fail to state facts that bring the case within, or potentially within, the policy's coverage, an insurer may properly refuse to defend. *Wilkin Insulation*, 144 Ill. 2d at 73 (citing *Hatherley*, 250 Ill. App. 3d at 336).

¶ 72    "The insurer bears the burden of establishing that it has no duty to defend." *Skolnik v. Allied Property & Casualty Insurance Co.*, 2015 IL App (1st) 142438, ¶ 26. "This burden includes affirmatively demonstrating the applicability of an exclusion." *Skolnik*, 2015 IL App (1st) 142438, ¶ 26. "[W]here an exclusionary clause is relied upon to deny coverage, its applicability must be clear and free from doubt because any doubts as to coverage will be resolved in favor of the insured." *International Minerals & Chemical Corp.*, 168 Ill. App. 3d at 367; see also *Wilson,* 237 Ill. 2d at 456 (" 'provisions that limit or exclude coverage will be

---

[5]We note that only Sentry's complaint alleges a duty to defend. However, Continental's arguments are based on the theory that if there is no duty to defend, there can be no duty to indemnify. As both policies contain identical language concerning "bodily injury" and "property damage," the duty to defend arguments would equally apply to both insurers.

interpreted liberally in favor of the insured and against the insurer' " (quoting *Koloms*, 177 Ill. 2d at 479)).

¶ 73 In the case at bar, as we have discussed above, the trial court properly concluded that there is no way to determine whether the Continental policy's exclusions apply without determining ultimate facts in the underlying lawsuits, thereby running afoul of the *Peppers* doctrine. Thus, at this stage of the proceedings, Continental is unable to "affirmatively demonstrat[e] the applicability of an exclusion" (*Skolnik*, 2015 IL App (1st) 142438, ¶ 26) and therefore cannot rely on the exclusions to establish that it has no duty to defend the Foundation because the applicability of the exclusions is not "clear and free from doubt," and we must resolve any doubts as to coverage in favor of the foundation. *International Minerals & Chemical Corp.*, 168 Ill. App. 3d at 367.

¶ 74 However, in considering the rest of the policy, which provides coverage for "bodily injury" and "property damage," the trial court is required to consider whether "the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage." *Outboard Marine*, 154 Ill. 2d at 108. This is something the trial court can do without deciding any ultimate facts in the underlying litigation. Accordingly, the trial court did not abuse its discretion in finding that it did not need to stay consideration of the duty to defend and may properly proceed to consider whether the allegations of the underlying complaints show the potential for coverage.

¶ 75 We emphasize that the duty to indemnify arises only "if the insured's activity and the resulting loss or damage *actually* fall within the *** policy's coverage." (Emphasis in original.) *Outboard Marine*, 154 Ill. 2d at 128. Thus, once the underlying facts required for consideration of the applicability of the exclusions are decided, the trial court will be able to determine whether the foundation's activity *actually* fell within the policy's coverage such that there is a duty to indemnify. However, for purposes of a duty to *defend*, since Continental is unable to "affirmatively demonstrat[e] the applicability of an exclusion" (*Skolnik*, 2015 IL App (1st) 142438, ¶ 26) at this point, the trial court could properly proceed to consider the rest of the policy's language to determine if a duty to defend arose.

¶ 76                                    IV. Settled Lawsuits

¶ 77 Finally, Continental argues that if the matter was properly stayed, then the stay should not extend to those underlying lawsuits that have already been resolved. Continental points to two lawsuits that have been settled and argues that the coverage litigation should proceed with respect to these suits. We do not find this argument persuasive.

¶ 78 The basis for Continental's argument on appeal is the citation of a number of other cases in which coverage litigation for certain lawsuits has proceeded while other lawsuits remain pending. However, in at least one of the cases it cites, there was no dispute between the parties as to whether litigation on some claims could proceed while others remained pending, as there is in the instant case. See, *e.g.*, *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 607 (1994) ("By agreement among the parties, this coverage trial was limited to eight specific underlying cases" that had been resolved, while approximately 200 remained pending.). In some of the other cases, the courts were considering section 2-619(a)(3) of the Code, which involves duplicative litigation and is not at issue here. See *Zurich Insurance Co. v. Baxter International, Inc.*, 173 Ill. 2d 235, 243 (1996); *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698 (2009).

¶ 79        Additionally, the mere fact that other courts have chosen to proceed in this manner does not mean that proceeding to consider coverage issues in the settled lawsuits here is required. As noted, "[t]he decision to grant or deny a motion to stay will not be overturned unless the court abused its discretion." *Guarantee Trust Life Insurance*, 2016 IL App (1st) 161612, ¶ 35; *Cholipski*, 2014 IL App (1st) 132842, ¶ 39. "The circuit court may stay proceedings as part of its inherent authority to control the disposition of cases before it. [Citation.] The court may consider factors such as the orderly administration of justice and judicial economy in determining whether to stay proceedings." *Philips Electronics*, 295 Ill. App. 3d at 901-02.

¶ 80        In the case at bar, the court found that it could not adjudicate coverage issues in the two underlying lawsuits that had settled, since a ruling concerning those cases could still have a collateral estoppel effect on the remaining underlying plaintiffs. The court further noted that the Foundation also had third-party complaints pending "which could be impacted by a ruling by this Court." We cannot find that the trial court's decision to take the more cautious route and wait until the resolution of all of the underlying lawsuits constituted an abuse of discretion.

¶ 81        Continental argues that staying the coverage litigation for the settled cases would unduly prejudice the insurer by delaying resolution of the litigation. However, proceeding with the litigation would prejudice the underlying plaintiffs and the Foundation by impacting their ability to litigate the underlying lawsuits and the third-party complaint. We thus cannot find that the trial court's decision in the instant case to favor the interests of the underlying litigants constituted an abuse of discretion merely because it would delay resolution of Continental's claims.

¶ 82                                CONCLUSION

¶ 83        For the reasons set forth above, the trial court did not abuse its discretion in staying consideration of coverage issues where its factual determinations in the coverage litigation could have an effect on the ultimate facts at issue in the underlying lawsuits. The trial court also did not abuse its discretion in proceeding to consider whether the allegations of the underlying complaints set forth facts that arguably fell within the policies' coverage such that it gave rise to a duty to defend. Finally, the trial court did not abuse its discretion in declining to adjudicate coverage issues on the two underlying lawsuits that had settled.

¶ 84        Affirmed.